## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| KRYSTYN ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:10-CV-91  PPS |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION AND ORDER

Plaintiff Krystyn Anderson filed an application with the Social Security Administration for child's survivor disability benefits following the passing of her mother.  An administrative law judge denied the application, finding Anderson not disabled because she's capable of working as a bagger at a retail store or as a "cleaner."  Anderson asks me to reverse the ALJ's decision outright.  Instead, for the following reasons, I am remanding the case to the ALJ.

### Procedural History

On July 25, 2007, Anderson applied for child survivor benefits alleging that she has been disabled due to mental retardation since birth.  [Tr. at 85-88.]  Her application was denied, as was her motion for reconsideration.  [*Id*. at 92-98.]  Anderson then requested a hearing before an ALJ, which was held on October 21, 2009.  [*Id*. at 32-78.]  At the hearing, Anderson testified, along with her aunt, Sabrina Clevy, and a vocational expert, Lee Knutson.  [*Id*.]  The ALJ denied her application, finding that Anderson was not disabled under the Social Security Act.  [*Id*. at 12-24.]  Anderson appealed the decision, but the Appeals Counsel denied review, making the ALJ's

decision final.  [*Id*. at 4-6]; *see* 20 C.F.R. §§ 404.981; *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007)).  Anderson timely filed this action on November 22, 2010.  [Tr. at 1.]

**Factual Background**

Anderson was 21 years old at the time she applied for survivor benefits based on the earnings of her deceased mother.  [*Id*. at 150.]  She is unmarried and was living with her mother at the time of death.  [*Id*.]  She has never worked.  [*Id*. at 17.]  Anderson claims that she has been disabled since birth because she is mentally retarded.

**A.     Medical Evidence**

Anderson demonstrated problems in intellectual functioning at a very early age.  As a First Grader, her teachers noted low test scores and problems with her capacity to learn the materials presented to her.  [Tr. at 206.]  As a Fifth Grader, in 1999, her IQ test demonstrated a verbal score of 46, performance score of 71, and a full scale IQ score of 56.  [*Id*. at 217.]  Her reading and vocabulary skills were significantly below age level, and she was put in special education classes for reading, language, and math.  [*Id*. at 218, 223.]  In 2002, IQ test results reflected a 67 verbal score, 64 performance score, and 63 full scale score.  [*Id*. at 233.]  At that time, she took special education classes and was diagnosed as having a "mild mental impairment."  [*Id*.]  In 2006, Anderson took another IQ test, which resulted in a full scale score of 65.  [*Id*. at 245.]  That same year, her reading skills were found to be woefully inadequate; she was in the 1st percentile of kids her age. [*Id*. at 246.]

In 2007, Anderson received her "Certificate of Course Completion" from high school, where she took both special education and mainstream courses.  [*Id*. at 392.]  Under Indiana law, a certificate of completion is awarded to students with disabilities who complete the special

-2-

education curriculum. *See* I.C. § 20-35-4-11.  Anderson's high school transcript shows that she finished with a 3.01 GPA and a class rank of 93 out of 261.  [*Id.*]  With that said, her reading comprehension remained low, and she was given significant accommodations in her classes including:  preferential seating, credit for oral participation, restated directions, open book tests, level of questions adjusted, extra time, reduced written work, oral tests, she was provided class notes, monitoring, shortened tests, and adjusted scoring.  [*Id.* at 253-54.]  Moreover, Anderson failed all of her Indiana Statewide Testing for Educational Purposes ("ISTEP") tests.  [*Id.* 269.]  Because she failed the ISTEP, she did not graduate from high school.

In September 2007, Anderson underwent psychological testing by Dr. Victor Rini.  [*Id.* at 425-31.]  According to Rini, Anderson had a verbal IQ score of 71, performance IQ score of 75, and a full scale IQ of 70.  [*Id.* 431.]  He diagnosed her with a borderline range of intellectual ability, with a significant deficit in social judgment.  [*Id.*]  Later that month, a non-examining state agency psychiatrist, Dr. Joelle Larson, reviewed Anderson's file and also determined that she has borderline intellectual functioning, generally adopting the conclusions set forth by Dr. Rini.  [*Id.* at 408.]  This finding was affirmed by another reviewing doctor, Dr. Donna Unversaw. [*Id.* at 432.]

In March 2009, Anderson was examined by psychologist Dr. Gary Durak. He determined that Anderson had a verbal IQ of 66, performance IQ of 75, and full scale IQ of 67.  [*Id.* at 484-85.]  Durak found that Anderson's overall level of intellectual functioning was very low and diagnosed her with a communication disorder, "mild mental retardation," and learning disabilities.  [*Id.* at 485.]

In 2008, Anderson also began showing signs of physical impairments.  On July 1, 2008,

Anderson checked into the Porter Hospital complaining of chest pay and rapid heart beat. [*Id.* at 460.] Based on her lab results from her two day stay at Porter Hospital, along with a thyroid scan taken on August 18, 2008, Anderson was diagnosed with Graves' disease, a thyroid condition. Anderson continued to complain of chest pains and rapid heartbeat throughout 2009. [*Id.* at 529.] She sought treatment for her thyroid condition during that period. [*Id.* at 491-510.]

**B.    Testimony at the Hearing**

On October 21, 2009, Anderson testified at a disability hearing before the ALJ. Anderson lives with her aunt. She explained that she does chores around her aunt's house like laundry, sweeping, dusting, but that she often has to stop and rest because of chest pains and heart palpitations due to her Graves' disease. [*Id.* at 41, 56.] For example, she can mop a long hallway, but then has to sit down and relax because her chest gets tight. [*Id.* at 64.] Anderson has her driver's permit (but not a license), and she drives her cousin up the long driveway at her aunt's house to take her cousin to the bus stop. [*Id.* at 49.] She testified that she can read, but she doesn't like to because she often cannot understand what she's reading and becomes frustrated. [*Id.* at 52.] Anderson stated that she is able to operate the microwave and cook simple foods on the stove, like box macaroni and cheese. [*Id.* at 55.] She has gone to the mall with family or friends on occasion and can walk around for a couple of hours before getting tired. [*Id.* at 58-59.] Anderson has never worked, and has never applied for a job. [*Id.* at 60.]

Anderson's aunt, Sabrina Clevy, testified next. Clevy stated that Anderson does laundry, washes dishes, sweeps the floor, and cleans the bathroom. [*Id.* at 66.] But according to Clevy, Anderson has difficulty performing these chores because her heart races and she becomes exhausted very quickly. [*Id.*] Clevy testified that Anderson can work about 30 to 40 minutes

before needing to rest for between 15 and 20 minutes. [*Id*.] Clevy claimed that she is with Anderson at all of her doctor's appointments, and Anderson's symptoms are consistent with her thyroid problems. [*Id*. at 67.] She explained that if Anderson's medication dosage is off, these symptoms persist; but taking her medication makes Anderson go to sleep. [*Id*. at 66-67.] Clevy testified that Anderson has difficulty understanding simple instructions, and she often needs instructions repeated multiple times before she understands them. [*Id*. at 68-72.] Anderson also has difficulty with routine clerical work, like organizing a stack of papers in alphabetical order. [*Id*. at 73.]

Finally, vocational expert Lee Knutson testified. The ALJ asked Knutson to consider an individual with the following characteristics: has a twelfth grade education; was in special education when she was young; has no past work experience; is unable to understand, remember, or carry out detailed instructions; is unable to maintain attention for extended periods; and has trouble interacting with the general public or traveling in unfamiliar places. [*Id*. at 74-75.] According to Knutson, jobs that fit that hypothetical include bagger at a retail store or unskilled cleaner. [*Id*. at 75-76.] But Knutson explained that there are no accommodations for an individual who could only work for 30 to 40 minutes before needing to rest for 10 or 20 minutes. [*Id*. at 76.]

## C.    Summary of the ALJ's Decision

The ALJ found that Anderson satisfied the first two steps of the five step inquiry that apply in determining whether an individual is disabled under the Social Security Act. At Step One, the ALJ determined that Anderson had not turned 22 years of age as of the date of the alleged onset of her disability, and she has never engaged in substantial gainful activity. The

ALJ then found that Anderson satisfied Step Two because she has three severe impairments: borderline intellectual functioning, Graves' disease, and a communication disorder.  [*Id*. at 17.]

At Step Three, the ALJ considered whether Anderson's condition satisfied the standard for "mental retardation" under Listing 12.05C.[1]  The ALJ found that Anderson did not meet Listing 12.05C "because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function.  I note that the claimant does not meet Listing 12.05 because she does not demonstrate evidence of the impairment before age 22."  [*Id*. at 19.] The ALJ then referenced two sets of IQ scores – one taken in September 2007 and the other March 2009 – and found the September 2007 score "more probative because the claimant's education level belies her low IQ score."  [*Id*.]  The ALJ explained his reasoning by citing to the fact that Anderson graduated high school, attended both special education and mainstream classes in high school, generally received A's and B's in school, graduated with a 3.01 gpa, and had a class rank of 93 out of 261.  [*Id*.]  The ALJ then listed the following facts to support his finding:  Anderson was diagnosed as having "only a mild mental disability"; she has a driver's permit; can count change, volunteer at a nursing home, do laundry, and make simple foods; and finally, Anderson can follow instructions when they are explained to her.  [*Id*.]

At Step Four, the ALJ assessed Anderson's residual functional capacity to determine the work-related activities Anderson could perform given her limitations.  He concluded that, while Anderson's mental and physical impairments could reasonably be expected to impact her ability

---

[1]  The ALJ also found that Anderson did not meet Listings 12.02 and 12.05A, B, and D, but Anderson only challenges the ALJ's findings under Listing 12.05C.

to work, Anderson's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." [*Id*. at 20.]  In making his assessment, the ALJ considered the September 2007 IQ examination, the September 2007 psychiatric review, and the March 2009 IQ examination, again finding the 2007 examination results and subsequent review more probative. The ALJ also considered her daily activities, including her ability to prepare simple meals, shop, and perform household chores, along with her success in high school.  He then found that Anderson's Graves' disease imposed no limitations, citing her trips to the emergency room, the fact that "she can walk around the mall for long periods of time," and the fact that her treating physician did not impose any additional limitations on her activity.  [*Id*. at 21-22.]

The ALJ did credit Clevy's testimony to the extent he found that Anderson is unable to understand, remember, and carry out detailed instructions, and she has a moderate inability to maintain attention and concentration for extended periods.  He also held that she has a moderate difficulty in traveling to unfamiliar places and has difficulty interacting with the general public. Yet the ALJ found that to the extent Anderson alleges greater limitations, her testimony was not credible.

Finally, at Step Five, the ALJ considered Anderson's age, education, work experience, and residual function capacity, and found that Anderson is not disabled.  He stated that, based on the testimony by the vocational expert, given her limitations, Anderson could work as a bagger (where there are 4,100 jobs available) and as a cleaner (39,000 job).

## DISCUSSION

Unless there is an error of law, the Court will uphold the Commissioner's findings of fact if they are supported by substantial evidence in the record.  *Rice v. Barnhart*, 384 F.3d 363, 369

(7th Cir. 2004); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  The ALJ must build a "logical bridge between the evidence and the result."  *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).  In doing so, the ALJ "need not evaluate in writing every piece of testimony and evidence submitted," *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993), but the "decision must be based upon consideration of all the relevant evidence," *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

An applicant for disability benefits must establish the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing any kind of gainful employment that exists in the national economy, considering her age, education, and work experience.  *Id*. § 423(d)(2)(A).

The SSA's regulations prescribe the familiar five-step sequential inquiry for an ALJ to determine whether an applicant is disabled:  (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520.  A claimant will automatically be found disabled if he satisfies Steps One, Two and Three.  But "if a claimant satisfies Steps One and Two, but not Three, then she must satisfy Step Four."  *Knight v. Chater*,

55 F.3d 309, 313 (7th Cir. 1995); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citation omitted). The initial burden in Steps One through Four is on the plaintiff, and the burden shifts to the Commissioner only at Step Five. *Clifford*, 227 F.3d at 868 (citing *Knight*, 55 F.3d at 313).

Anderson argues that the ALJ erred by finding that she is not disabled under Step Three because she did not meet the standards for mental retardation under Listing 12.05C. She next claims that the ALJ's credibility findings are not supported by substantial evidence. Finally, Anderson asserts that the ALJ erroneously found that she can work as a bagger or cleaner. I will address each of these arguments in turn.

## A.      Mental Disability under Listing 12.05C

Listing 12.05 lays out the standard for demonstrating a disability based on mental retardation. The introductory paragraph to Listing 12.05 states that, to meet the criteria of mental retardation, the claimant must prove "significantly subaverage intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. § 404, subpt. P, app. 1 § 12.05. Paragraph C also requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id*. § 12.05C. A claimant must meet both the Listing's definition of mental retardation and the required severity level by satisfying the requirements in Paragraph C. *Id*. § 12.00; *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). So to meet Listing 12.05C, the claimant must prove: 1) subaverage intellectual functioning with deficits in adaptive functioning prior to age 22;  2) a valid IQ between 60 and 70; and 3) an additional impairment that imposes a significant work-related limitation.

Here, the ALJ found that Anderson did not meet Listing 12.05C because Anderson "does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function." [Tr. at 19.]  He went on:  "I note that the claimant does not meet Listing 12.05 because she does not demonstrate evidence of the impairment before age 22."  [*Id.*]  In support, the ALJ cited two IQ tests – a March 2009 full scale score of 67 and a September 2007 full scale score of 70 – and found the September 2007 test more probative of her actual ability because "her education level belies her low IQ score."  [*Id.*]  The ALJ supported his finding by noting Anderson's academic success, her "mild mental disability," and her ability to drive with supervision, count change, volunteer at a nursing home, do chores around the house, and follow instructions that are explained to her.

The ALJ's analysis is unclear.  While he correctly recited the test, generally concluded that each prong had not been met, and cited record evidence to support his conclusion, he did not tie the evidence to any particular prong of the three-part test.  So I will examine each prong of the test to determine whether his findings are supported by substantial evidence.

I begin by addressing the third prong – "a physical or other mental impairment imposing an additional and significant work-related limitation or function" – because it is readily apparent that this prong is satisfied.  In Step 2, the ALJ explicitly found that Anderson has "the following *severe* impairments:  borderline intellectual functioning, Graves' disease, and a communication disorder."  [Tr. at 17 (emphasis added).]  This is generally enough to show that Anderson has an additional impairment imposing a work-related limitation.  *See Brooks v. Astrue*, 2008 WL 5392027, at *6 (N.D. Ind. Dec. 23, 2008) (recognizing that a finding that the claimant has a

"severe" impairment at Step Two satisfies the second requirement of Listing 12.05C of an

additional impairment that imposes significant work-related limitation of function); *Anthony v.*

*Astrue*, 2011 WL 2728059, at *6 (S.D. Ind. July 12, 2011) (same); 20 C.F.R. § 404.1520©

("severe impairments" are ones that "significantly limit your physical or mental ability to do

basic work activities"). The ALJ's conclusory finding that Anderson does not have "a physical

or other mental impairment imposing an additional and significant work-related limitation or

function" [Tr. at 17] is unsupported by any evidence or explanation. There certainly is not

substantial evidence to support that finding.

Next, I must determine whether the ALJ correctly found that Anderson did not have a

valid IQ score of 60 through 70. The ALJ began his analysis by disregarding the March 2009

test results, which indicated that Anderson had a full scale IQ of 67. Instead, the ALJ concluded

that the September 2007 IQ test, wherein she scored a 70, was "more probative" of her abilities.

[Tr. at 17.] First, the ALJ ignored many IQ tests in the record where Anderson scored much

lower (more on this in a moment). But in any event, even if I were to accept that the 2007 test

was the only probative one – and actually it seems like the outlier – it still qualifies under Listing

12.05C. Recall that Paragraph C requires an " IQ of 60 *through* 70" not between 60 and 70.

And the ALJ did not find that this score was invalid. *See Maggard v. Apfel*, 167 F.3d 376, 380

(7th Cir. 1999) ("[Listing] 12.05C requires an IQ score to be 'valid.'"). Neither did any of the

doctor's who administered or analyzed the IQ test. *See Strack v. Astrue*, 2011 WL 4062524, at

*15-16 (N.D. Ind. Sept. 13, 2011) (low IQ score invalid where evaluating doctor found that the

claimant's "IQ scores were underestimates of his actual cognitive ability"). I can only conclude

from this that the ALJ believed that this prong was met.

-11-

So the issue is whether the ALJ correctly found that Anderson "does not meet listing 12.05 because she does not demonstrate evidence of the impairment before age 22" as the Introductory paragraph dictates.[2] [Tr. at 17.]  The Introductory paragraph requires "not only a low IQ score but deficits in adaptive functioning."  *Hendricks v. Astrue*, 2009 WL 648610, at *7 (S.D. Ind. Mar. 11, 2009).  Thus, Anderson's low IQ score and physical impairments are not enough by themselves to find her disabled.  *See Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007).  Instead, her "activities of daily living, work experience, and education must be consistent with [her] low IQ score to satisfy Listing 12.05."  *Wright v. Astrue*, 2011 WL 1486208, at *7 (N.D. Ind. Mar. 31, 2011); *see Maggard,* 167 F.3d at 380 (finding low IQ scores insufficient where claimant showed an ability to perform his work assignments, understand and follow directions, relate to coworkers, and withstand the stress of daily work).  As a result, I must determine whether the ALJ's conclusion – that Anderson's IQ score, daily activities, and education are inconsistent with mental retardation – is supported by substantial evidence.

Unfortunately, omissions in the ALJ's analysis prevent me from making this call.  *See Shramek*, 226 F.3d at 811.  The Seventh Circuit is clear that the ALJ's determination "must be based upon[] all of the relevant evidence in the record."  *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984).  So "[w]hile it is often impracticable and fruitless for every document to be

---

[2]  I should note that, while it is far from clear, the ALJ may have implicitly found that the IQ score of 70 was invalid because it did not reflect Anderson's actual ability.  In other words, the ALJ may have been saying that even the IQ score of 70 did not demonstrate mental retardation based on the other evidence on the record.  But whether the ALJ rested his finding on the IQ score's validity, the introductory paragraph, or both, my analysis below applies equally in any case.  *See Anthony*, 2011 WL 2728059, at *6 ("The [IQ] test scores satisfy both the IQ score requirement in subparagraph C as well as provide evidence . . . to meet the requirement in the introductory paragraph of 12.05").

discussed separately, an ALJ may not select only the evidence that favors his ultimate conclusion." *Id.*  This means that an ALJ "may not simply ignore evidence," *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009), or "cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).  When the court is unable to discern whether the ALJ considered the record as a whole, a remand is necessary.  *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2001); *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000) ("The ALJ's failure to consider the evidence of dizziness alone precludes us from evaluating whether substantial evidence existed to support the ALJ's finding") (internal quotations omitted).

That's precisely the case here.  First, in finding Anderson not disabled, the ALJ relied heavily on the fact that Anderson graduated high school, took both special education and mainstream courses, generally received A's and B's, had a GPA of 3.01, and had a class rank of 93 out of 261.  On its face, this may appear to be compelling evidence that Anderson is not mentally retarded.

But this evidence does not present the whole picture.  First, the ALJ's analysis completely ignores the fact that Anderson received extensive accommodations throughout high school.  These accommodations included:  preferential seating, credit for oral participation, restated directions, open book tests, extra time, reduced written work, oral tests, class notes, monitoring, shortened tests, *level of questions adjusted*, and *adjusted scoring*.  [*Id.* at 253-54 (emphasis added).]  By their very terms, these accommodations inflated Anderson's grades and class rank, suggesting her grades are not reflective of her actual intellectual ability.  *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) (finding that the ALJ ignored substantial evidence

-13-

where "the ALJ did not explain why he gave no weight to the portions of the school documents which support a finding that [the claimant] is disabled.").

In fact, Anderson's grades are inconsistent with her true level of achievement. For example, as an 18 year old high school junior, Anderson was tested as having an IQ of 65 – a score which was ignored by the ALJ. Additionally, a standardized test administered that same year put her in the first percentile in reading comprehension. [Tr. at 246.] The ALJ also did not reference a full scale IQ score of 63 from 2002 [Tr. at 233] and a full scale IQ score of 56 from 1999 [*id.* at 223]. This is all consistent with other evidence suggesting that Anderson has a very low reading ability. [*Id.* at 52, 254.] Based on her limited ability to comprehend what she reads, it stretches reality to suggest that, for example, Anderson's A minus grade in her 2005 English class reflects her true ability. [*Id.* at 392.] What's more, despite her high grades, Anderson failed all of her ISTEP tests, which prevented her from graduating high school, facts that the ALJ also ignored in his analysis. It appears that the ALJ may have viewed the certificate of completion that Anderson received to be the equivalent of a high school diploma. But it is not. In any event, all of this evidence puts Anderson's high school grades in context and is evidence that Anderson's lower IQ scores may indeed be probative of her actual ability, while seriously calling into doubt the validity of her grades. Given the ALJ's heavy reliance on Anderson's academic record in finding Anderson did not meet the listing, he should have addressed this evidence one way or another in his decision.

The ALJ similarly failed to consider context in applying the other evidence he relied on in concluding that Anderson failed to meet Listing 12.05C. For example, while the ALJ correctly noted that Anderson is able to drive with supervision, he overlooks the fact that she

failed her driver's test and only drives to the end of the driveway at her house, not on public roads. This evidence is certainly relevant in determining whether Anderson's driving abilities demonstrate that she does not have deficits in intellectual and adaptive functioning. Also, while the ALJ concluded that Anderson can follow instructions when they are explained to her, he neglected to note that she often does not grasp simple instructions and needs instructions repeated multiple times before she understands them. [Tr. at 71-73.]

Finally, put in proper context, the fact that Anderson can count change, volunteer at a nursing home, and perform chores around the house is not necessarily persuasive evidence of Anderson's intellectual ability. First, the evidence does not suggest what type of work Anderson performs at the nursing home. (Is she merely keeping elderly patients company?) Also, the Seventh Circuit has "cautioned the Social Security Administration against placing undue weight on a claimaint's household activities in assessing the claimant's ability." *Mendez*, 439 F.3d at 362. This is especially true when the evidence suggests that the claimant has difficulty performing those chores – as is the case here, another fact the ALJ failed to address. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (finding the ALJ's analysis deficient where the "[u]ncontested evidence not mentioned by the [ALJ] reveals that she performs these chores with difficulty, and with the aid of [others]").

In the end, my problem with the ALJ's decision is that it appears he cherry-picked evidence supporting his conclusion, without considering evidence that points to the contrary. *Denton*, 596 F.3d at 425. And, conversely, if he did consider this additional evidence but rejected it, I have no way knowing that based on his decision. *See Zurawski*, 245 F.3d at 888 (remanding where "the ALJ mentions only the medical evidence favoring the denial of benefits.

-15-

And from her analysis, we are unable to discern whether she considered the record as a whole.").

As a result, a remand is necessary.

**B.      Credibility Findings**

Next, Anderson argues that the ALJ's credibility findings are not supported by

substantial evidence.  Because the ALJ is in the best position to evaluate credibility, I review an

ALJ's credibility findings with deference and may not disturb the weighing of credibility so long

as the determinations are not "patently wrong."  *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir.

2009).  To evaluate credibility, an ALJ must "consider the entire case record and give specific

reasons for the weight given to the individual's statements."  SSR 96-7p.  The ALJ should

consider objective medical evidence, the claimant's daily activities, allegations of pain,

aggravating factors, types of treatment received and medication taken, and "functional

limitations."  *See* 20 C.F.R. § 404.1529(c)(2)-(4); *Simila*, 573 F.3d at 517.  If the ALJ gives

specific reasons for his credibility determination, which are supported by the record, his

determination will stand.  *Murphy v. Astrue*, 496 F.3d 630, 635 (7th Cir. 2007).  But the ALJ

may not disregard a claimant's testimony about the severity of her symptoms without providing

careful analysis.  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 353-55 (7th Cir. 2005).

Here, the ALJ found that Anderson's "statements concerning the intensity, persistence

and limiting effects of [her] symptoms are not credible."  [Tr. at 20.]  In assessing Anderson's

credibility, he considered many of the same factors discussed in the previous section – her ability

to perform chores around the house, shop, drive, and her academic success.  The ALJ also

considered Clevy's testimony but credited only her statements regarding Anderson's misuse of

words and her ability to remember and understand instructions.  In the face of this testimony, the

medical evidence, and Anderson's activities, he accommodated Anderson's impairments by finding her unable to understand detailed instructions, maintain attention, interact with the general public, and travel in unfamiliar places. But he found Anderson's Graves' disease did not impose any physical limitations. He concluded his analysis by stating: "To the extent the claimant alleges greater limitations her testimony is not fully credible." [*Id*. at 22.]

The ALJ's credibility analysis is inadequate. First, the ALJ does not explain which statements by Anderson or Clevy were not credible. *See Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011) (the ALJ must explain "which [] statements are not entirely credible or how credible or incredible any of them are."). Instead, he merely finds that Anderson's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible, " and "[t]o the extent the claimant alleges greater limitations her testimony is not fully credible." But this is precisely the boilerplate language that the Seventh Circuit routinely criticizes as legally insufficient. *See Id*.; *McClesky v. Astrue*, 606 F.3d 351, 352 (7th Cir. 2010); *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010) (finding this exact language "meaningless boilerplate," which "yields no clue to what weight the trier of fact gave the testimony").

In addition, without explanation, the ALJ ignored contrary testimony by Anderson and Clevy in finding that Anderson's Graves' disease did not impose any physical limitations, presumably because he did not find the testimony credible. For example, he completely fails to reference Clevy's testimony that Anderson can only work 30 to 40 minutes before needing to rest for between 15 and 20 minutes. [Tr. at 66.] He also ignores Anderson's testimony that she can only work for short periods before she has to stop and rest. [*Id*. at 56.] This is important because the ALJ asked the vocational expert whether there were any jobs for an individual who

-17-

had to stop and rest during the course of cleaning, and the vocational expert testified that there are no accommodations for an individual who could only work for 30 to 40 minutes before needing to rest for 10 or 20 minutes.  [*Id*. at 76.]

And yet, rather than explain why this testimony was not credible, the ALJ supported his finding that Anderson's Graves' disease did not cause any physical limitations by relying on record evidence that doesn't necessarily call the testimony into doubt.  First, the ALJ pointed to the fact that Anderson "can walk around the mall for long periods of time."  [*Id*. at 21.]  But, like his analysis of Listing 12.05C, this misrepresents Anderson's actual testimony – she testified that she can be on her feet at the mall for "only a couple of hours."  [*Id*. at 59]; *see Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (finding "minimal daily activities" like two hours of household chores "does not undermine or contradict [the claimant's] claim of disabling pain").  He also points to Anderson's many trips to the emergency room for irregular heart rate, hyperthyroidism, and chest paints between 2008 and 2009.  But the fact that Anderson has to go to the emergency room every few months despite her treatment for Graves' disease actually supports a finding that this impairment imposes additional physical limitations.

The ALJ finally cites to the fact that Anderson's doctor has not imposed any physical limitations on Anderson's level of activity.  But the absence of evidence from her doctor does not necessarily mean that Anderson's and Clevy's statements about her physical limitations are not credible.  *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) ("[A]n ALJ cannot disregard subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record.") (citing S.S.R. 97-7p); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("The ALJ said he disbelieved Villano's testimony about her

inability to sit . . . because no medical evidence supported such a limitation, but as we have noted, a lack of medical evidence alone is an insufficient reason to discredit testimony."); 20 CFR § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."). In fact, "[i]f the medical record does not corroborate the level of pain reported by the claimant, the ALJ must develop the record and seek information about the severity of the pain and its effects on the applicants." *Moss*, 555 F.3d at 561; *Clifford*, 227 F.3d at 871-72. The same goes here – if the ALJ believed that the medical evidence did not support Anderson's and Clevy's testimony about the physical effects of her impairment, he should have sought additional information.

In addition, the ALJ's reliance on Anderson's daily activities (chores, shopping, driving) and academic success (grades, class rank) in doubting Anderson's statements about her mental impairments is insufficient for the same reason his Listing 12.05 analysis fails – he ignored evidence on the record inconsistent with these findings. *See Murphy*, 496 F.3d at 635 (remanding where "the ALJ's credibility finding is intertwined with the same gaps in the record and reasoning that require us to vacate his determination of [the claimant's] disability."). Moreover, while the ALJ did consider Anderson's communication disorder in finding that she has a moderate inability to interact with the general public, he did not consider how this limitation would affect her ability to interact with supervisors or coworkers.

In sum: the ALJ's credibility determinations concerning Anderson's physical and mental impairments are not supported by substantial evidence. Thus, a remand is required so the ALJ

can clarify the basis for his credibility findings consistent with this opinion.

## C.    The ALJ's Jobs Findings

Finally, Anderson argues that the ALJ erroneously found that she can work as a bagger or cleaner because the ALJ failed to accurately describe Anderson's limitations to the vocational expert.  At the hearing, the ALJ asked the vocational expert to consider work options for an individual with the following characteristics:  has a Twelfth Grade education; was in special education when she was young; has no past work experience; is unable to understand, remember, or carry out detailed instructions; is unable to maintain attention for extended periods; and has trouble interacting with the general public or traveling in unfamiliar places.  [Tr. at 74-75.]  The Commissioner concedes that the ALJ erred by finding that Anderson could work as a bagger because the ALJ did not ask the vocational expert about Anderson's communication disorder, but contends the error was harmless because Anderson can work as a cleaner.

An ALJ has an "affirmative responsibility" to ask a vocational expert about any possible conflicts between a vocational expert's testimony about a job's requirements and information in the Dictionary of Occupational Titles (DOT).  *Overman v. Astrue,* 546 F.3d 456, 462-63 (7th Cir. 2008).  If the expert's testimony "appears to conflict with the DOT," the ALJ "will obtain a reasonable explanation for the apparent conflict."  SSR 00-4p.  But not asking a vocational expert about a conflict is a harmless error if there is no actual conflict. See *Terry v. Astrue,* 580 F.3d 471, 478 (7th Cir. 2009).

Here, it's clear that the ALJ did not ask whether Anderson's communication disorder conflicts with the DOT requirements for working as a bagger.  And given the issues I have raised regarding Anderson's education history, I have concerns as to whether Anderson can meet the

reading requirements necessary for a cleaning position.[3]  Anderson testified that, although she

can read, she has trouble understanding what she reads.  [Tr. at 52.]  And, as I noted above, all of

her test scores note extremely low reading comprehension.  On remand, the ALJ should

thoroughly address this issue to determine if Anderson has the ability to work as a cleaner given

all of her physical and mental impairments.

### CONCLUSION

Accordingly, Anderson's motion for summary judgment [DE 19] is **GRANTED**, and this

case is **REVERSED** and **REMANDED** to the Commissioner for proceedings consistent with

this opinion pursuant to 42 U.S.C. § 405(g).  The clerk is instructed to **TERMINATE** this case.

**SO ORDERED**.

ENTERED: October 14, 2011.

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[3]  The DOT number for Cleaner, Industrial, 381.687-018, requires:  "Language: Level 2 - READING: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute.  Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation.  Read instructions for assembling model cars and airplanes."